**In re Ronald SIMEONE, Debtor.**

**Ronald SIMEONE, Plaintiff,**

**v.**

**Jeanne [1] SIMEONE, Defendant.**

**Bankruptcy No. 97–13506DAS.**
**Adversary No. 97–0654DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 13, 1997.

---

**1.** In the Complaint, the Debtor erroneously spelled his ex-wife's name "Jean." We have corrected the spelling because there is no extensive litigation between the parties except in the state court, where her name is spelled correctly. *Compare Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 558 n. 1, 100 S.Ct. 790, 793 n. 1, 63 L.Ed.2d 22 (1980) (Court retains incorrect spelling to achieve consistency with prior decisions in case).

Lee M. Herman, Broomall, PA, General Counsel for Debtor.

Michael P. Pierce, Pierce & Hughes, P.C., Broomall, PA, Special Counsel for Debtor.

L. Theodore Hoppe, Jr., Black & Associates, Inc., Media, PA, for Defendant.

Edward Sparkman, Phila., PA, Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently at issue is a proceeding ("the Proceeding") initiated by RONALD SIMEONE ("the Debtor") to equitably distribute the marital property regarding which a dispute remains between the Debtor and his ex-wife, JEANNE SIMEONE ("the Wife"), consisting mostly of three parcels of real property. Considering all of the factors set forth in the applicable state law, 23 Pa.C.S. § 3502(a), which are relevant to this dispute, plus the facts that the Debtor has been in possession of all of the properties in issue for the past nine years and that he does not appear to be a responsible financial manager, we hold that a fair and equitable distribution of the assets is to give the Wife full title to two triplexes and to allow the Debtor to keep a property in which he operates a motor vehicle repair service. To even the distribution, we will allow the Debtor to retain his modest IRA, and we hold that our disposition eliminates all of the otherwise secured claims of the Wife against him. We also fix the future rent of the Debtor, who resides in one unit of one of the triplexes, at $600/month including utilities.

### B. FACTUAL AND PROCEDURAL HISTORY

The parties were married on December 8, 1973. After a separation in November 1985, they reconciled, apparently in 1987, but separated permanently on December 1, 1988. The Wife filed a Complaint for Divorce in the Court of Common Pleas of Delaware County ("the C.C.P.") on August 6, 1986, which she resumed after the reconciliation failed, and a

bifurcated divorce was entered on August 10, 1990.

The docket entries of the C.C.P. action reflect continuous efforts of the Wife to alter the status quo, which left the Debtor in possession of all three parcels of real estate owned by the parties by the entireties at separation. These included two triplexes at 50–52 Windemere Avenue ("Windemere") and 180 North Union Avenue ("Union"), Lansdowne, Pennsylvania, valued in March 1997 by Kenneth P. Barrow, Jr., a C.C.P. court-appointed broker, at $150,000 and $110,000, respectively, and a building housing Ron's Car Care ("Ron's"), the Debtor's auto repair service business, at 195 North Wycombe Avenue, Lansdowne, Pennsylvania ("Wycombe"), which is adjacent to the Union property, the range of values of which Barrow fixed at $115,000 to $125,000.

Although the Debtor was ordered to pay all real estate taxes due on all of the properties, the Wycombe property was sold at a September 11, 1995, tax sale. Conveniently, the purchaser was the Debtor's current wife, Susan Whiteside, for $21,495.86.

The Union property was damaged by a fire in 1985. The Debtor collected, but has not accounted for, insurance proceeds which he testified amounted to $62,000. He further testified that Union was rehabilitated between 1988 and 1993 with these proceeds and loans of $44,000 from his parents, Albert and Mary Louise Simeone ("the Parents").

The first floor unit at Windemere was the parties' residence during their marriage and remains the Debtor's residence. The Wife claimed that $30,000 of the Union insurance proceeds were used to install a swimming pool at this property. Both triplexes are fully tenanted at present, but the Debtor claimed that there have been periodic vacancies over the years, not quantified by his testimony nor his voluminous written records.

On March 7, 1997, a Divorce Hearing Officer ("the DH Officer") submitted recommendations which proposed a sale of the properties, a 55–45 division of the proceeds in favor of the Wife, and a $5,000 award towards her counsel fees in light of the Debtor's "uncoop-

erative...posture...result[ing] in excessive legal expenses." The Debtor excepted to this Recommendation and the matter percolated further in the C.C.P. for two years. The last C.C.P. order, on March 12, 1997, directed the Debtor to respond to certain outstanding discovery of the Wife within seven days.

On March 24, 1997, possibly to avoid complying with that order, the Debtor filed the instant individual Chapter 13 bankruptcy case. On April 4, 1997, the Wife moved for relief from the automatic stay in this court to resume the C.C.P. action. After a hearing of that date, we entered an order of April 24, 1997, stating that, unless the Debtor or the Standing Chapter 13 Trustee, Edward Sparkman, Esquire, commenced an action to pursue equitable distribution in this court by May 15, 1997, relief would be granted to the Wife. This order was consistent with our holdings in *In re Sokoloff*, 200 B.R. 300, 301 (Bankr.E.D.Pa.1996); *In re Simpson*, 140 B.R. 857, 860 (Bankr.E.D.Pa. 1992); and *In re Ziets*, 79 B.R. 222, 224 (Bankr.E.D.Pa.1987), *aff'd*, 1988 WL 220217 (E.D.Pa.1988), expressing reluctance to allow equitable distribution proceedings, which necessarily involve significant estate assets, to be maintained in nonbankruptcy forums. The parties both appeared satisfied with this result, the Debtor because he could avoid the C.C.P. action and the Wife because it presented a prospect of a swift final resolution of the matter and a change of the status quo.

The Debtor then filed the instant Proceeding on May 15, 1997. After two continuances it was tried on October 1, 1997. After completion of the trial, we entered an order allowing the parties an opportunity to supplement the record with depositions of experts relating to potential environmental contamination of the Wycombe and Union properties, and to make initial submissions by October 31, 1997. In addition, they were each given leave to submit any replies to their respective opponent's initial submission by November 7, 1997. Although we denied an attempt of the Debtor to depose an expert addressing the tax sale of the Wycombe property, and the Debtor then chose not to take any depo-

sitions, the Debtor saw fit to attach a report regarding contamination of Wycombe to its brief. That brief was, moreover, submitted only after we denied a request for a week's extension which was opposed by the Wife.

On November 5, 1997, at a hearing originally scheduled to determine the consequences of any late submission by the Debtor, we shared with the parties our general intention to attain the instant result, and invited any comments. Only the Wife chose to submit a reply, therein vigorously protesting the Debtor's attempt to submit the environmental report as an exhibit to his brief and also protesting our proposed award as allegedly distributing to her only forty-seven (47%) percent of the marital estate. Much of the argument focused upon our reluctance to direct the Debtor to pay any part of the claim of the Wife's counsel for fees and costs amounting to $73,061.64.

The confirmation hearing in the main bankruptcy case was originally scheduled on September 16, 1997, and has now been continued to December 16, 1997. The only timely proofs of claim filed were (1) a secured claim of $25,484.65 by Eleanor P. Guille, who holds a blanket mortgage against the Union and Wycombe properties which appears to be the only valid outstanding mortgage against any of the properties; (2) secured claims reflecting that 1995 and 1996 real estate tax liens were filed against Windemere and Union, in the respective amounts of $10,682,44 and $5,948.04, by the Delco Tax Claim Bureau; and (3) an unitemized secured claim of $435,746.83 filed by the Wife. An objection to the Wife's claim was filed by the Debtor on October 16, 1997, and is listed for a hearing on December 9, 1997.

The Debtor's plan contemplates payments of $100 monthly for 36 months. Holders of "two mortgages" on Union are to be paid outside of the plan. The reference to a mortgage other than that held by Guille is apparently to a Mortgage of September 6, 1995, on the Union and Wycombe properties in favor of the Parents in the amount of $71,741.00. However, as the Parents' Mortgage was executed only by the Debtor, it appears to be invalid, and cannot constitute a valid secured claim against at least the Union property.

The issues presented were simplified in comparison to the panoply of matters potentially at issue in an equitable distribution dispute by the parties' agreement that all matters regarding the division of personalty have been resolved by agreement or rendered moot by the passage of time except the distribution of the Debtor's Individual Retirement Account ("IRA"), valued at $10,000. The testimony therefore focused on the realty.

On this subject, the Debtor produced an inch-thick volume including copies of a myriad of receipts for services and repairs allegedly performed to maintain the properties from 1988 through 1995, and similar information updated to the time of trial. The 1988–95 volume is fronted by a page which purports to summarize its contents, although we could not perceive the correlation. The bottom line of this summary reports an excess of expenditures over income of $365,072.83.

These records were not supported by federal tax returns, as the Debtor had not filed any returns between 1988 and the present as of the date of his bankruptcy filing. He recently had returns prepared for tax years 1992 through 1996, which were admitted into evidence, and it was noted that completion of returns for tax years 1988 through 1992 were a work in progress. The tax returns, rather than reflecting any losses in connection with the properties, reported income of $5,621 in 1996, a break-even in 1995, and income of $1,964.12, $4,807.48, and $165.98 in 1994, 1993, and 1992, respectively.

When asked about the discrepancies between his own summaries and the tax records, the Debtor admitted that his records were inaccurate and contended that the tax records were correct. The inaccuracies of the summaries were also punctuated by cross-examination establishing that the Debtor had no excess income to pump into the properties, let alone $365,000; and the common sense observation that, if these properties were such a significant losing venture, the Debtor had no motivation to justify his clinging to them.

Nevertheless, in his post-trial submission to this court, the Debtor, apparently relying on these figures, makes the unlikely argument that over $379,000 was expended in renovating the Union property. He also claims that, based on the environmental report attached to his brief, costs to clean up contamination on the Union and Wycombe properties will exceed $200,000. In his C.C.P. deposition in March 1997, Barrow disputed the contention that contamination rendered any of the property unmarketable, claiming that recent "Brownfields" legislation and proper marketing would continue to support his appraisal figures.

The Wife, through non-CPA tax accountant Kathleen Showalter, presented a different version of the rental picture. Utilizing the fair rental values of the properties established by Barrow's appraisal, deducting only receipts submitted by the Debtor which she deemed clearly attributable to the properties, and crediting only the taxes for which she was supplied records, which ran through only 1993, Showalter ascertained that the "net rents" on all three properties, from 1988 to date, amounted to a positive figure of $107,-911.39.

It is unclear to us precisely what expenses Showalter deducted from the hypothetical gross rents. For instance, it is not clear that the Guille monthly mortgage payments of $1,156.15 were deducted. Of course, it is unclear, from either the Debtor's records, his accounting, or the Guille proof of claim, whether these payments are current. The proofs of claim submitted by the Tax Claim Bureau suggest that taxes run about $5,000 annually on Windemere and about $2,750 annually on Union; however, these claims also suggest that no tax payments were made by the Debtor after 1994.

Showalter made no allowances for vacancies in the triplexes. Her calculations also presumably include Barrow's attribution of rents to the Debtor. Barrow fixed the Wycombe rent at $1,000/monthly in 1988 and 1989, $1,100/monthly in 1990 and 1991, and $1,200/monthly in 1992 and 1993. The Debtor was directed to pay future rents of $550/month for his Windemere apartment into escrow on May 17, 1990, and Barrow opined

that the rental value of this unit had increased to $600/month as of February 22, 1994. The Debtor testified, however, that only $1,352 was presently deposited into escrow.

Showalter claimed that her figures approximated those in the Debtor's tax returns. While the figures contained in the tax returns were certainly closer to her figures than the admittedly-inaccurate figures in the Debtor's summary, we find too many omissions and uncertainties in her calculations to accept same as accurate.

The tax returns also report very modest taxable income of the Debtor from his operation of Ron's. His adjusted gross income is reported as $5,754.17, $10,063.97, $5,072.55, $2,766, and $8,739 for tax years 1992 through 1996, respectively. The only year yielding taxable income, after exemptions and deductions, is 1996, in the grand total of $289. However, we note that the returns are individual and provide no information about the income of Whiteside, the Debtor's new spouse. The Wife apparently disputes the Debtor's tax return figures as under-reported, claiming that Ron's generated gross income of $2,000 weekly when they were together.

The record lacks any information about the Wife's income, although such figures are obviously relevant to equitable distribution. In post-trial colloquies of October 28 and November 5, we were informed that she formerly was employed as a realtor but presently works a large daily newspaper route, from which she earns about $50,000 annually. At trial she admitted that she deducted one half of the real estate taxes and mortgage payments payable on the parties' properties from her federal tax returns, although she in fact had made none of these payments.

The parties have two children from the marriage, Ronald Jr. ("Ron"), who is twenty and attending Kutztown State University; and Michael, aged 16, who lives with the Wife. The Wife testified that, although Ron lives with the Debtor during college breaks, she has paid his tuition and room and board at college of $8,000 annually with the exception of an initial $1,000 payment made by the

Debtor. The Wife and Michael reside some distance away from Lansdowne in Exton, Pennsylvania, in a home owned by the Wife's mother, to whom she reportedly pays $700/month rent. The Wife denied knowledge of a federal tax lien of $2,933.82 against her on account of 1991 taxes, a copy of which was placed of record by the Debtor.

The Wife's counsel, as indicated below, claims $73,061.64 for his firm's representation of her in the parties' domestic dispute in the C.C.P., supported by a detailed fee application. This figure seems very high given the relative simplicity of the issues, small amount of the estate at issue, and modest results in the C.C.P. proceedings. It was justified as necessary to protect the Wife from the Debtor's vows to destroy her and refusal to comply with court orders. We perceived a strong motivation on the part of the Debtor to perpetuate the status quo, which allows him to have a rent-free residence at Windemere and a rent-free place of business at Wycombe. In addition, it provided him income from the Union insurance proceeds in the past and the triplexes' rents at all pertinent times. However, we perceived little retributory fire in the Debtor's testimony, possibly because he has remarried. He did exhibit a lack of money management skills and extreme procrastination in resolving important matters, including not only his differences with the Wife, but also such matters as paying real estate taxes and filing his federal income tax returns. We find the Debtor to be a poor candidate for honoring financial commitments, in or out of bankruptcy. The Wife, meanwhile, impressed us as a more capable financial manager and perhaps understandably, due to the disadvantages to her in the long-standing status quo, more angry with the Debtor than he with her.

## C. DISCUSSION

### 1. BANKRUPTCY COURTS RARELY ARE CALLED UPON TO DECIDE EQUITABLE DISTRIBUTION.

The position of the Debtor appears to be that, in light of credits due to him, which he very optimistically and with no basis of support fixes at more than $500,000, for ren-

ovating the properties, he owes nothing to the Wife. The Wife's initial proposal argued for an 80–20 distribution in her favor which she appears to translate into her obtaining Windemere plus being allowed a very large secured claim, apparently at least $226,000, in the Debtor's instant Chapter 13 case. Her reply brief, clinging to the 80–20 distribution formula, appears to argue that she should receive a secured claim for the $73,061.64 counsel fees in addition to Windemere and Union. We find that both parties have unrealistic expectations about results which are fair to both.

The applicable Pennsylvania statute relating to equitable distribution is 23 Pa.C.S. § 3502(a), which provides as follows:

**§ 3502. Equitable division of marital property**

**(a) General rule.**—In an action for divorce or annulment, the court shall, upon request of either party, equitably divide, distribute or assign, in kind or otherwise, the marital property between the parties without regard to marital misconduct in such proportions and in such manner as the court deems just after considering all relevant factors, including:

(1) The length of the marriage.

(2) Any prior marriage of either party.

(3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.

(4) The contribution by one party to the education, training or increased earning power of the other party.

(5) The opportunity of each party for future acquisitions of capital assets and income.

(6) The sources of income of both parties, including, but not limited to, medical, retirement, insurance or other benefits.

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker.

(8) The value of the property set apart to each party.

(9) The standard of living of the parties established during the marriage.

(10) The economic circumstances of each party, including Federal, State and local tax ramifications, at the time the division of property is to become effective.

(11) Whether the party will be serving as the custodian of any dependent minor children.

At the outset we note that it is rare that we, sitting as a bankruptcy court, become involved in equitable distribution. That is because, as we cited in *In re Simpson*, 140 B.R. 857, 859 (Bankr.E.D.Pa. 1992),

a request for equitable distribution of marital property of the parties cannot proceed unless and until the parties are divorced, or the issues of divorce and distribution are bifurcated, . . . . See *e.g., In re Bryan*, . . .1990 WL 369448 (Bankr.E.D.Pa. Nov. 21, 1990); *In re Garafolo*, Bankr.No. 88–12027F, slip op. at 2 n. 2 (Bankr.E.D.Pa. March 21, 1990); *Drumheller v. Marcello*, 516 Pa. 428, 432, 532 A.2d 807, 809 (1987); *Verdile v. Verdile*, 370 Pa.Super. 475, 479, 536 A.2d 1364, 1366 (1988); *Campbell v. Campbell*, 357 Pa.Super. 483, 488, 516 A.2d 363, 366 (1986), *allocatur denied*, 515 Pa. 598, 528 A.2d 955 (1987); *Laxton v. Laxton*, 345 Pa.Super. 450, 455, 498 A.2d 909, 912 (1985); and *Dech v. Dech*, 342 Pa.Super. 17, 22, 492 A.2d 41, 43 (1985). The decision to bifurcate should also be made by the state courts, after carefully weighing the advantages and disadvantages of doing so. See *Wolk v. Wolk*, 318 Pa.Super. 311, 317–18, 464 A.2d 1359, 1362 (1983).

See also *Prall v. Prall*, 698 A.2d 1338, 1340 (Pa.Super.1997).

Although we believe that the advisability of bankruptcy court's abstention from resolving domestic issues is often overstated, as a quick resolution of such issues is often essential to a debtor's reorganization or fresh start, we also believe that adjudicating divorces, like the resolution of child custody and support matters, must be reserved to the state courts. Therefore, as a corollary to the holding in *Sokoloff, Simpson,* and *Ziets, supra,* that relief from the automatic stay to pursue equitable distribution in state court should not be perfunctory, we note that often it will be necessary, because a state court may determine that the divorce aspect of post-separation litigation should not be bifurcated from equitable distribution. In the instant C.C.P. domestic relations case, perhaps because of the parity of the parties' financial situations, bifurcation was allowed. Hence, this is the ostensibly rare case where an equitable distribution dispute is properly presented to this court.

2. *APPLICATION OF THE GENERAL FACTORS CONTROLLING EQUITABLE DISTRIBUTION IN PENNSYLVANIA TO THE INSTANT FACTS.*

The general methodology to be utilized in applying the factors set forth in § 3502(a) is thusly articulated in *Smith v. Smith*, 439 Pa.Super. 283, 294, 653 A.2d 1259, 1264, *appeal denied*, 541 Pa. 641, 663 A.2d 693 (1995):

"there is no simple formula by which to divide marital property. The method of distribution derives from the facts of the individual case. The list of factors of [section 3052(a) ] serves as a guideline for consideration, although the list is neither exhaustive nor specific as to the weight to be given the various factors. Thus, the court has flexibility of method and concomitantly assumes responsibility in rendering its decisions." *Semasek v. Semasek*, 331 Pa.Super. 1, 11, 479 A.2d 1047, 1052 (1984), *modified*, 509 Pa. 282, 502 A.2d 109 (1985).

Thus, courts effecting equitable distribution are to aim for the broad end of "effectuat[ing] justice," *Gill v. Gill*, 450 Pa.Super. 611, 615, 677 A.2d 1214, 1216 (1996), by displaying "concerns for the mutual well being of the parties," *Pangallo v. Pangallo*, 329 Pa.Super. 25, 33, 477 A.2d 885, 889 (1984), rather than becoming fixated on computing the distribution process by any sort of predetermined mathematical formula. See *Cerny v. Cerny*, 440 Pa.Super. 550, 556, 656 A.2d 507, 510 (1995).

■ The statute makes clear that "marital misconduct" is not to be a factor in equitable distribution, and attempts to inject this factor or other "moral" issues, which often linger in domestic disputes, have been rebuffed by the courts. *See Witcher v. Witcher,* 433 Pa.Super. 14, 20–21, 639 A.2d 1187, 1190–91, *appeal denied,* 538 Pa. 648, 647 A.2d 903 (1994), *cert. denied,* 513 U.S. 1094, 115 S.Ct. 759, 130 L.Ed.2d 657 (1995); *Perlberger v. Perlberger,* 426 Pa.Super. 245, 259–62, 626 A.2d 1186, 1192–95 (1993); and *Berrington v. Berrington,* 409 Pa.Super. 355, 369, 598 A.2d 31, 38 (1991), *aff'd,* 534 Pa. 393, 633 A.2d 589 (1993). It appears to us that the Wife has attempted to inject this factor, emphasizing, as she does, the Debtor's wrongdoings in the C.C.P. with strident accusations.

The factors which are articulated in 23 Pa.C.S. § 3502(a) appear to our perhaps untrained eye to be a mixed bag, including several irrelevant and useless factors as well as a good deal of redundancy. It is not clear why the first two factors, the length of a marriage and a party's prior marriages, are relevant at all, and, if they are, how these issues are to be weighed in the decision-making process. In any event, they appear irrelevant here. Factors (3), (5), (6), (9), and (10) appear somewhat redundant. All of these factors could be summarized as requiring that both parties' present and future prospects for income and acquisition of assets should be considered. Applying this summary of the foregoing factors to the instant facts, we find that the parties are fairly equal in their present and future prospects of earning income and of asset-accumulation, although the Wife is slightly better off. Factor (4) is not relevant here. Factor (11) appears fairly equal, since the parties have apparently shared custody, and the children are no longer very young. The Wife's acceptance of greater responsibilities in this area probably nets out some of her income and assets advantage. The parties' resolution of other distributional matters renders factor (8) a non-issue. The factor about which the parties have the greatest disputes appears to be (7), focusing upon dissipation or preservation of the parties' real estate. A somewhat extended analysis of that factor follows.

3. *ANALYSIS OF THE CONTRIBUTIONS AND/OR DISSIPATION BY THE DEBTOR TO THE REAL ESTATE IN ISSUE.*

The position of the Debtor appears to be that he preserved the non-appreciating, jointly-held real property at issue at great financial sacrifice. The Wife counters that the Debtor acted officiously and that he dissipated the Wycombe property by letting it go to a tax sale.

■ We agree with the Wife's argument that, despite the tax sale, the Wycombe property lies within the definition of "marital property," since it was acquired by the parties during the marriage, *see* 23 Pa.C.S. § 3501(a), and must therefore be included in the marital estate for purposes of distribution. Had the Debtor dissipated this property by losing it at a tax sale, its value would nevertheless have been chargeable to him, as its dissipator, in a distribution. *See Beener v. Beener,* 422 Pa.Super. 351, 360–62, 619 A.2d 713, 718–19 (1993); *LaBuda v. LaBuda,* 349 Pa.Super. 524, 539, 503 A.2d 971, 979 (1986), *appeal denied,* 514 Pa. 648, 524 A.2d 494 (1987); and *Elensky v. Donohue,* 21 Pa. D. & C.3d 97, 99 (C.P.1981). However, the Wycombe property was not lost. Rather, it was retained by Whiteside's purchase of it at the tax sale. It appears to us that this entire transaction may have been collusive, calculated to attempt to cut off the Wife's interest in this property. On the other hand, the distinct possibility remains that the Debtor, as another aspect of his poor financial management, unintentionally almost let the property slip away. We need not resolve this issue because we find that, in either event, Wycombe must be counted as property subject to distribution and the Debtor's retention of this property chargeable to his side of the distribution ledger.

■ The law is rather clear regarding the Debtor's liability for appropriation of the real property to himself. Generally, he is liable for one-half of the rental value of the property which he occupied or used, *see Ressler v. Ressler,* 434 Pa.Super. 563, 571–72, 644 A.2d 753, 757–58 (1994); and *Trembach v. Trembach,* 419 Pa.Super., 80, 88, 615 A.2d

33, 36–37 (1992), and one-half of the income received from the other tenants. *See Beener, supra,* 422 Pa.Super. at 361–62, 619 A.2d at 718–19; and *Williams v. Williams,* 373 Pa.Super. 143, 149–50, 540 A.2d 563, 566 (1988). While credit is normally provided to the party in possession for half of the expenditures, *see id.,* such compensation is subject to denial where it is necessary to do so to adjust the parties' circumstances. *See Schneeman v. Schneeman,* 420 Pa.Super. 65, 80–82, 615 A.2d 1369, 1377–78 (1992).

The Debtor is therefore clearly chargeable with rent of his apartment at Windemere and his use of Wycombe for his business for the past nine years. Measuring these rents slightly to the Debtor's advantage to allow for some period that Wycombe was closed for business while governmental environmental protection agencies removed certain storage tanks therefrom, yields a total rent liability of about $1,500/monthly for 108 months, one half of which computes to $81,000.

The Debtor's income from other tenants at the triplexes is very difficult to measure. The submission of the Debtor reflecting a large net *loss is* rejected by us out of hand as a valid measurement, as even the Debtor, in his testimony, refused to support it. Showalter's figure of $107,911.39 also appears inaccurate, because it assumes full tenancy of the triplexes, its underlying support documents were not produced, and Showalter was unclear in describing exactly what she did deduct as necessary expenditures. The tax returns, reporting net income of about $12,500 between 1992 and 1996 appear more accurate, but they include deductions for depreciation, which should be attributable to the Wife as well as the Debtor, and they include expenses the accuracy of which is probably dependent upon the Debtor's records, the accuracy of which, in turn, is doubtful. The Union property was, however, probably at least partially vacant during the 1988 to 1991 period due to the fire. Taking all of the foregoing into account, we find that net income of about $30,000 was generated by the tenancies from 1988 to date, half of which, or $15,000, should be credited to the Wife.

### 4. *MAKING THE APPROPRIATE DISTRIBUTION.*

 Before rendering our final distribution order, we consider three other issues. First, we find that the real properties in issue should be valued as of the date of distribution rather than the date of separation.

In cases where a long period of time has passed between the separation and the distribution, the court should set values as close to distribution as possible. *Sutliff v. Sutliff,* 518 Pa. 378, 543 A.2d 534 (1988). *McNaughton v. McNaughton,* 412 Pa.Super. 409, 414, 603 A.2d 646, 649 (1992). *But see Litmans v. Litmans,* 449 Pa.Super. 209, 230–36, 673 A.2d 382, 392–95 (1996). The parties appear to agree that the current value should be utilized. There has not been great fluctuation in any event, per Barrow. Moreover, the parties appear to agree that Barrow's valuations recited at page 540 *supra,* can be utilized, *e.g.,* $150,000 for Windemere, $110 for Union, and $115–125 for Wycombe.

 Second, although the Wife claims that the good will of Ron's should be valued and its value distributed, the weight of authority appears to the contrary. No hard assets of Ron's have been identified. The Debtor is Ron's only employee, and good will of a business is not to be factored into an equitable distribution when the good will of the business, like Ron's, is attributable to the skill of a particular individual. *See Butler v. Butler,* 541 Pa. 364, 378–81, 663 A.2d 148, 155–57 (1995); *Solomon v. Solomon,* 531 Pa. 113, 124–25, 611 A.2d 686, 691–92 (1992); *Perlberger, supra,* 426 Pa.Super. at 262–67, 626 A.2d at 1195–98; and *Beasley v. Beasley,* 359 Pa.Super. 20, 30–41, 518 A.2d 545, 549–55 (1986), *allocatur denied,* 516 Pa. 631, 533 A.2d 90 (1987).

 Finally, since the Wife's counsel discusses the issue at length, it is necessary for us to consider the law applicable to awards requiring one spouse to pay the counsel fees of the other. The principles underlying such awards are set out thusly in *Johnson v. Johnson,* 365 Pa.Super. 409, 415, 529 A.2d 1123, 1126 (1987), *allocatur denied,* 517 Pa. 623, 538 A.2d 877 (1988):

counsel fees are not awarded to either spouse automatically. *Diamond v. Diamond, supra* [360 Pa.Super. 101] at 116, 519 A.2d [1012] at 1019 [1987]. "Actual need must be shown in order to justify an award." *Dech v. Dech,* 342 Pa.Super. 17, 23, 492 A.2d 41, 44 (1985), citing *Hoover v. Hoover,* 288 Pa.Super. 159, 161–62, 431 A.2d 337, 338 (1981). Counsel fees are appropriate when necessary to put the parties "on a par" in defending their rights or in allowing a dependent spouse to maintain or defend an action for divorce. *See Miller v. Miller, supra,* 352 Pa.Super. at 442, 508 A.2d at 556, *Dech v. Dech, supra; Young v. Young,* 274 Pa.Super. 298, 302, 418 A.2d 415, 417 (1980).

The court, in *Gill v. Gill,* 450 Pa.Super. 611, 620, 677 A.2d 1214, 1218–19 (1996), states that

> [t]he purpose of a counsel fee award is to enable the more dependent party to litigate the action without being placed at a financial disadvantage. *Sutliff v. Sutliff,* 326 Pa.Super. 496, 474 A.2d 599 (1984).

*See also Perlberger, supra,* 426 Pa.Super. at 283–85, 626 A.2d at 1206–07; and *Lowenschuss v. Lowenschuss,* 327 Pa.Super. 120, 122–27, 475 A.2d 127, 129–31 (1984).

The Debtor relies upon *Endy v. Endy,* 412 Pa.Super. 398, 407–08, 603 A.2d 641, 646 (1992), for the principle that a party responsible for prolonging litigation is entitled to the fees generated by such conduct. *See also Perlberger, supra,* 426 Pa.Super. at 283–85, 626 A.2d at 1206–07 (counsel fees denied to wife whose opponent was a leading domestic relations attorney and whose income far exceeded hers, because the wife's counsel was found to have unreasonably attempted to dispute settled law).

■ There is no showing of financial need on the part of the Wife, particularly when compared to the poor financial picture of the Debtor. The litigation before us does not suggest that the Wife is a "more dependent party" and her counsel's vigor, at least in this forum, has far exceeded that of the Debtor's counsel. However, we believe that the Debtor has in fact contributed to delay in the C.C.P. litigation by his lack of compliance with court orders. We concur with the DH Officer that an award in the neighborhood of $5,000, perhaps doubled for two years worth of additional acts in defiance of court orders since the DH Officer's Report, might be appropriate on these grounds. However, we cannot agree, irrespective of the massive timesheets and documentation in support of same, that an award of anything close to $73,000 would be appropriate.

■ The foregoing analysis leads us to conclude that an appropriate equitable distribution can be effected by requiring the Debtor to deed the two triplexes to the Wife. The value of these properties, per Barrow, totals $260,000. They are, however, subject to the Guille mortgage of $25,454.645 and tax liens totalling $16,630.48. Additional liabilities probably exist for recent delinquencies on the Guille mortgage and 1997 taxes. These perhaps total another $10,000 to $15,000, rendering our best estimate of the equity value of the triplexes to be approximately $205,000.

The principal item of value received by the Debtor in the distribution would be Wycombe, valued at $115,000 to $125,000, but subject to the mortgage of the Parents in an amount between the $44,000 actually loaned by the Parents and the $71,741.00 face amount of the mortgage. We have some skepticism regarding the true amount due on this obligation. No proof of claim was filed by the Parents and the Mortgages, though possibly valid against Wycombe, appear potentially collusive. The net value of Wycombe therefore appears to us to be at least $75,000. We will not deduct any sum for potential contamination of Wycombe because, as the Wife points out, the expert report appended to the Debtor's brief cannot be considered as part of this record. *See In re Blanchard,* 201 B.R. 108, 114 n. 1 (Bankr. E.D.Pa.1996); and *In re Cook,* 146 B.R. 934, 939 (Bankr.E.D.Pa.1992). Furthermore, we credit Barrow's deposition testimony that such contamination will not greatly depress Wycombe's value. Finally, we note that any such contamination may also affect the nearby Union property, and we are not deducting from its value on the Wife's side of the ledger for that reason.

■ The other matter of value attributable to the Debtor is abatement of the Wife's claims against him. In this connection, we are presented with an interesting bankruptcy law issue, which we requested the parties to address, concerning the classification of any claim arising out of equitable distribution which the Wife might have against the Debtor. In accordance with the reasoning of Judge Sigmund of this court in *In re Bennett,* 175 B.R. 181 (Bankr.E.D.Pa.1994), we hold that the Wife's claims would properly be classified as secured because they reflect special property interests which would survive bankruptcy, and not as general unsecured claims. *Cf. In re Roberge,* 188 B.R. 366 (E.D.Va.1995), *aff'd,* 95 F.3d 42 (4th Cir. 1996) (a filing of a bankruptcy petition does not extinguish ownership interests in marital property; nondebtor spouse permitted to file a petition for equitable distribution even after debtor filed for bankruptcy); *In re Califf,* 195 B.R. 499 (Bankr.N.D.Ala.1996) (spouse's entitlement under equitable distribution award of portion of debtor's military retirement account held to be property right not susceptible to being discharged); *In re Ford,* 78 B.R. 729, 736–37 (Bankr.E.D.Pa.1987) (wife holds special interest in account holding jointly-owned funds); and *In re Johnson,* 51 B.R. 439, 443–44 (Bankr.E.D.Pa.1985) (nondebtor spouse is granted relief from the automatic stay to allow state court to determine debtor's ownership interest in real property subject to equitable distribution proceeding).

*Bennett, supra,* 175 B.R. at 185–87 expressly rejects the reasoning of *In re Polliard,* 152 B.R. 51, 53–55 (Bankr.W.D.Pa.1993); and *In re McCulley,* 150 B.R. 358, 360 (Bankr.M.D.Pa.1993), that a nondebtor's claims against marital property are properly classified as general unsecured claims. Agreeing with *Bennett,* we note that a nondebtor spouse is a joint owner of marital property. An official, recorded security interest is not a prerequisite for assertion of a secured claim in such circumstances, just as it is not a prerequisite for a just demand of adequate protection to protect certain other special interests in property, *see In re Shapiro,* 124 B.R. 974, 982–83 (Bankr.E.D.Pa. 1991). The Wife's interest as part owner of the parties' marital property is comparable to a landlord's title to real estate occupied by a debtor, which clearly entitles the landlord to adequate protection from the occupant-debtor.

The Wife could therefore rightfully assert a secured claim with respect to her interests in the Debtor's IRA ($10,000), the rental value of the Debtor's use of the Windemere and Wycombe properties ($81,000), half of the net rentals realized from the properties ($15,000), and whatever we would allow toward the Wife's counsel fees (say, $10,000). That brings the value of the Debtor's share of the distribution up to $191,000, which is less, but not significantly so, than the Wife's share valued at $205,000. It is thus difficult for us to understand why the Wife would be the more vigorous objector to this distribution.

We also note that we have not factored in, as a positive on the Wife's side of the distribution ledger, her deductions of half of the mortgage payments and real estate taxes on her federal income tax returns. We do not do so because deductions for these allowances would be inappropriate, just as the deductions themselves were improper. After the Internal Revenue Service ("the IRS") analyzes the Debtor's tax returns seeking deductions for the entire amount of the same payments deducted in part by the Wife, the IRS may well detect her improper deductions and seek to hold her liable on account of them. The deductions are thus likely to be offset and therefore should not be considered.

As the 23 Pa.C.S. § 3502(a) factors come out almost even and support pretty nearly a 50–50 distribution, if any party is favored in this distribution, it is the Wife. However, we are not troubled by favoring her to some degree. The DH Officer would have favored her, 55 to 45. We give her about a 52–48 advantage. Moreover, it must be recalled, *see* pages 544–545 *supra,* that equitable distribution is not to be formula-driven, but tailored to effectuating justice and the well-being of the parties. The Debtor has proven himself to be a procrastinator incapable of selling these properties or managing them properly by keeping their taxes current.

The Wife, a former real estate broker, promises to apply skills which are likely to result in, alternatively, the sale or the proper management of these properties.

Moreover, the Debtor lacks the liquid assets to make payments to the Wife. He has not been keeping up with his seemingly-compulsory tax burdens, even when not obligated to make payments to the Wife in addition. It is doubtful that he would pay off any monetary obligation which we would impose. The Wife's only recourse if he failed to do so would be to execute on his property. It seems better and cheaper to simply give her these properties and, if necessary, let her sell one or the other to pay her counsel or whatever other obligations arise for her.

Our intention is to make a permanent division of the assets which will not be dependent on future sales or payments by one party to the other. We thus favor a clean break between the parties. We can discern no other just division of the three properties at issue which would come as close to achieving this end.

One aspect of our decision precludes the preferred clean break between the parties. As a result of this distribution, the Debtor will become the Wife's tenant in his Windemere apartment. We will fix December 1, 1997, as the date of transfer of equitable title to the properties and direct the Debtor to deliver deeds to the Wife to effect the transfer by November 24, 1997. We clarify that our disposition assumes that the Wife will pay the Guille mortgage and all taxes, including those necessary to effect our order, *e.g.*, any necessary realty transfer taxes. It also presumes that the Debtor will pay a reasonable rental to the Wife on December 1, 1997, and as long thereafter as he remains a resident of the Windemere first-floor apartment. We will fix the Debtor's present rent at Barrow's most recent fair rental figure, $600 per month including utilities.

Our Order will also have the effect of eliminating the Wife's large secured claim, and therefore allowing cancellation of the December 9, 1997, hearing on the Debtor's objection thereto. It also articulates a basis on which the Debtor should be able to settle or object to the other secured claims filed in this case, *i.e.*, they are secured by property which he will no longer own, which should render his present plan incapable of confirmation. We would suggest that the Debtor's counsel immediately embark on settling or objecting to these claims to achieve confirmation of a Chapter 13 plan in this case, either on December 16, 1997, or shortly thereafter, as we are not inclined to allow more than one additional continuance of that hearing.

## D. CONCLUSION

An order effectuating the within Opinion will be entered.

### ORDER

AND NOW, this 13th day of November, 1997, after a trial of the above-captioned proceeding on October 1, 1997, and upon consideration of the parties' post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. The parties' cross-requests for equitable distribution of their marital property are both GRANTED IN PART.

2. RONALD SIMEONE ("the Debtor") is hereby AWARDED the marital property located at 195 North Wycombe Avenue, Lansdowne, Pennsylvania, and his Individual Retirement Account.

3. JEANNE SIMEONE ("the Wife") is hereby AWARDED the marital properties located at 50–52 Windemere Avenue, Lansdowne, Pennsylvania, and 180 North Union Avenue, Lansdowne, Pennsylvania, subject to all mortgages and taxes owed thereon or payable in connection with the transfer of same.

4. In consideration for the award made in paragraph 3 *supra*, the Wife's secured proof of claim against the Debtor is STRICKEN in its entirety. The hearing of December 9, 1997, on the Debtor's objection to this proof of claim is therefore CANCELLED as moot.

5. In connection with the award made in paragraph 3 *supra*, the Debtor shall deliver to the Wife's counsel, on or before November 24, 1997, duly-executed deeds to the Wife of his interests in the properties awarded to her. The Wife may request this court to

direct the Clerk of this Court to execute these documents if the Debtor refuses to do so. *See* Federal Rule of Bankruptcy Procedure 7070, incorporating Federal Rule of Civil Procedure 70.

6. The Debtor shall also be liable to pay rent of $600 monthly, including utilities, to the Wife beginning on December 1, 1997, and continuing for as long as he remains a tenant in the first floor apartment at 50–52 Windemere Avenue, unless this figure is amended by agreement of the parties, order of this court while this case remains open, or order of another court of competent jurisdiction after this case is closed. Any rents unpaid may be allowable as administrative expenses pursuant to 11 U.S.C. § 503(b)(1)(A).