In re William E. BRUGGER, Debtor.

Sherry Sue Brugger, Movant,

v.

William E. Brugger, Respondent.

No. 5–98–03949.

United States Bankruptcy Court,
M.D. Pennsylvania.

May 15, 2000.

Kevin Walsh, Kingston, for Debtor/Respondent.

William G. Schwab, Lehighton, for Movant.

Charles J. Dehart, III, Hummelstown, Trustee in Bankruptcy.

## *OPINION*[1]

JOHN J. THOMAS, Bankruptcy Judge.

On October 15, 1998, Judge Linda Miller, Court of Common Pleas of Monroe County, Pennsylvania, issued a decree ordering the divorce of William E. Brugger (hereinafter "Debtor") and Sherry Sue Brugger (hereinafter "Creditor Spouse").[2] The decree also ordered equitable distribution of marital property and approved the Master's Recommendation, as modified by the court. (Divorce Decree, Joint Exhibit E). The largest obligation incurred by the Debtor was the court ordered buy-out of Creditor Spouse's 50% legal and equitable interest in XICIS Corporation, which is a

software company formed by the Bruggers during their marriage, servicing the flavor and fragrance industry. *Brugger v. Brugger*, Court of Common Pleas of Monroe County, Forty–Third Judicial District, Commonwealth of Pennsylvania; No. 503 D.R.1996 (October 15, 1998)(Joint Exhibit B). At the Master's hearing, Creditor Spouse produced an expert's valuation of XICIS, but Debtor only offered his personal opinion concerning value. (Master's Report ¶ 39(b) at 7–8, Joint Exhibit A). After weighing the testimony and the report, the Master adopted the expert's valuation of XICIS. *Id.* Based on this report, the Master found that the value of XICIS Corporation on May 15, 1996, the date of separation, was $1,170,000. *Id.* Because of the specialized nature of the business, Debtor was ordered to purchase Creditor Spouse's 50% share of the business for $585,000. *Id.* This amount was to be paid in a lump sum within 90 days or over a period of five years with 8% interest. *Id.;* *Brugger*, No. 503 D.R.1996 at 2 (Joint Exhibit B). When all shares are purchased, Creditor Spouse was required to relinquish her 50% control over the corporation. *Brugger*, No. 503 D.R.1996 at 3 (Joint Exhibit B). Subsequently, Debtor filed for relief under Chapter 13 on November 17, 1998. (Docket Entries for Bankruptcy Case No. 5–98–03949, Joint Exhibit 1)

■ Creditor Spouse argues that the state court equitable distribution award is not considered debt under the Bankruptcy Code, rather, it is a property interest. In her brief, Creditor Spouse asserts that

---

1. Drafted with the assistance of Mark R. Owens, Law Clerk.

2. Certified copies of Master's, Therese Anne Hardiman, Esquire, Report and Recommendation (Joint Exhibit A); Judge Linda Miller's Opinion on *Brugger v. Brugger*, Court of Common Pleas of Monroe County, Forty–Third Judicial District, Commonwealth of Pennsylvania; No. 503 D.R.1996 (October 15, 1998)(Joint Exhibit B); Monroe County Docket Entries for *Brugger v. Brugger*, Case Number 1996–02972 (Joint Exhibit C); Judge

Linda Miller's Order denying Defendant's Petition for Reconsideration, No. 503 D.R.1996, No. 2972 Civil 1996 (November 13, 1998)(Joint Exhibit D); and a copy of a certified copy of the Divorce Decree (October 15, 1998)(Joint Exhibit E) were handed-up to the Court for review by the parties and were entered into evidence without objection. (Transcript of February 25, 1999 at 4–5, 16–17.) These exhibits were not marked at trial and have been designated as Joint Exhibits A–E.

"Equitable distribution rights to marital property are by definition property interests of the non-debtor (as well as of the debtor) spouse under the Pennsylvania Divorce Code, 23 Pa.C.S. § 3101, *et seq.* Consequently, a claim for equitable distribution does not constitute a debt or a claim within the meaning of and is therefore not dischargeable under the Bankruptcy Code." *In re Ingebrethsen,* 1998 WL 351730 (E.D.Pa.1998) citing *In re Bennett,* 175 B.R. 181 (Bankr.E.D.Pa. 1994) and *In re Simeone,* 214 B.R. 537 (Bankr.E.D.Pa.1997).

Creditor Spouse also cites *In re Scholl,* 234 B.R. 636 (Bankr.E.D.Pa.1999), as "reflect[ing] the current trend in the 3rd Circuit." In *Scholl,* the Bankruptcy Court held that "Plaintiff's vested right to equitable distribution of marital property not yet determined by an order of the state court is unaffected by her estranged spouse's bankruptcy." *Id.* at 645. Since, in *Scholl,* the debtor filed for bankruptcy after the commencement of the divorce but prior to the equitable distribution award, the marital property was in *custodia legis. Id.* at 637, 642.

■ Even if I were to accept this line of reasoning, Creditor Spouse is mistaken in her application of *Scholl* to the matter at issue. *Scholl* is distinguishable because the debtor filed for bankruptcy after the divorce complaint was filed, but before the equitable distribution order. The issue of timing is very important when determining property interests. Upon filing for divorce, the parties "hold[ ] a vested, inchoate right to the equitable distribution of marital property," and a debt or claim might not arise until the property is distributed to the respective spouses. *Id.* at 637. The property at this point may be considered in *custodia legis* awaiting distribution; however, once property distribution is ordered and becomes individual property, a debt or claim can arise. In the case at bar, the debt owing to Mrs. Brugger was certainly in existence when the common pleas court imposed an obligation on Debtor to "buy-out"[3] Creditor Spouse's share of XICIS Corporation. Therefore, the property was already equitably distributed to the respective parties. The resulting right to payment ordered by the court certainly creates a debt on behalf of the obligor.

In further support of her argument, Creditor Spouse relies on *In re Lowenschuss,* 170 F.3d 923 (9th Cir.1999). This case is also distinguishable from the matter at issue because in *Lowenschuss,* the wife was awarded "an outright ownership interest in 38.7% of [husband's] pension plan assets, rather than merely a money judgment against debtor." *Id.* at 923. This interest in husband's pension plan was held not dischargeable because it was a property interest and not considered a debt. *Id.* at 929–930. Prior to the divorce complaint, the wife did not have an ownership interest in debtor's pension plan. *Id.* The case at bar is different because Creditor Spouse was awarded a money judgment in the form of a buy-out of her 50% interest in XICIS, which was determined as a result of equitable distribution. Similarly to the case before me, in *In re Custer,* 208 B.R. 675 (Bkrtcy.N.D.Ohio 1997), the court had to determine "the dischargeability of the Debtor's obligation under the stock buyout agreement" to purchase wife's shares in the family owned business.

**3.** Buyout—"The purchase of a controlling percentage of a company's shares. A buyout can be accomplished through negotiation, through a tender offer, or through a merger." Blacks Law Dictionary 201 (6th ed.1990). Pennsylvania courts have used the "buy-out" remedy in equitable distribution awards under certain circumstances. 23 PA. CONS. STAT. ANN. § 3502 (West 1991). The " '[b]uy-out' remedy for division of personal property in divorce actions may be appropriate under particular circumstances and thus court is not required to order 'in kind' distribution of spouse's stock in closely held corporation." *Ryan v. Ryan,* 528 Pa. 186, 596 A.2d 140 (1991). Furthermore, "[n]either 'in kind' distribution nor 'buy-out' remedy was required method for equitable division of former husband's stock in closely held corporation, which was major marital asset." *Id.*

*Id.* at 678. The court applied 11 U.S.C. § 523(a)(5) and held that the obligation was nondischargeable. *Id.* at 679. To be considered under 11 U.S.C. § 523(a)(5), there would have to be a debt.

Similar facts to the case at bar are found in *In re Patterson*, 132 F.3d 33, 1997 WL 745501 (6th Cir.1997), where the Sixth Circuit affirmed the Bankruptcy Court's application of 11 U.S.C. § 523(a)(15). *Id.* The Bankruptcy Court held that debtor's obligation "pursuant to a [Pennsylvania] state court's order in the parties' divorce action" to pay Creditor Spouse $31,606.88 "represent[ing] $25,000 for one-half of the value of their marital business and $6,606.88 for one-half of the marital credit card debt" was nondischargeable. *Id.* at *1. To reach this holding 11 U.S.C. § 523(a)(15)[4] was utilized, thus, the obligation to buy-out Creditor Spouse's interest in the marital business was considered a debt under the Bankruptcy Code.

According to 11 U.S.C. § 101(12) " 'debt' means liability on a claim." Under 11 U.S.C. § 101(5) " 'claim' means—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured [.]"

The United States Supreme Court in *Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 1216, 140 L.Ed.2d 341 (1998) held that

A "debt" is defined in the Code as "liability on a claim," § 101(12), a "claim" is defined in turn as a "right to payment," § 101(5)(A), and a "right to payment," we have said, "is nothing more nor less than an enforceable obligation." (citations omitted). [Furthermore,] [t]hose definitions "reflec[t] Congress' broad ... view of the class of obligations that qualify as a 'claim' giving rise to a 'debt'[.]"

Following a broad interpretation of 11 U.S.C. § 101(5)(A) & (12), as instructed by the Supreme Court in *Cohen*, this Debtor's obligation fits within the Bankruptcy Code. Creditor Spouse gained a right to payment when Judge Miller ordered Debtor to purchase her 50% interest in XICIS Corporation for $585,000. *Brugger*, No. 503 D.R. 1996 at 2–3, 7 (Joint Exhibit B). Therefore, under 11 U.S.C. § 101 *et seq.*, the obligation to purchase the shares ordered by the court is a debt incurred as part of an equitable distribution order.

 Creditor Spouse further argues that this case should be dismissed as a bad faith filing. Even though the obligation is considered a debt pursuant to the Bankruptcy Code and case law, a filing for relief under Chapter 13 can be dismissed if not filed in good faith. The Third Circuit held that "lack of good faith in [a Chapter 13] filing is sufficient cause for dismissal under section 1307(c)." *In re Lilley*, 91 F.3d 491, 496 (3d Cir.1996). It is the discretion of the Bankruptcy Court to determine good faith on a case-by-case basis looking at the totality of the circumstances. *Id.*

Factors relevant to the totality of the circumstances inquiry may include, among others, the following: the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the

---

4. In 1994, Congress voiced their intent to include obligations created for equitable distribution awards as an exception to discharge under the Bankruptcy Code by adding 11 U.S.C. § 523(a)(15), which segregated debt not considered alimony, maintenance, or support under 11 U.S.C. § 523(a)(5) but otherwise " 'incurred by the debtor in the course of a divorce or separation.' " *In re Carney*, 1999 WL 395373, *3 (Bankr.E.D.Pa.)(quoting 11 U.S.C. § 523(a)(15) (1999)).

debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id.* (quoting *In re Love,* 957 F.2d 1350, 1357 (7th Cir.1992)). Primarily, an analysis of good faith allows the Bankruptcy Court to determine "'whether or not under the circumstances of the case there has been an abuse of the provisions, purpose, or spirit of [the Chapter].'" *In re Love,* 957 F.2d 1350, 1357 (7th Cir.1992) (quoting *In re Rimgale,* 669 F.2d 426, 431 (7th Cir.1982)).

### "[T]he nature of the debt"

At the time of filing, Debtor was faced with an Equitable Distribution Order and a buy-out obligation of $585,000. Debtor neither had the ability to satisfy this debt nor the belief that under the circumstances he could ever satisfy this debt. (Transcript of February 25, 1999 at 43–48, 66–71.) XICIS Corporation was in a downward trend and the company's future was uncertain. To add to the Debtor's financial troubles, the state court ordered the transfer of assets totaling approximately $295,700 in partial satisfaction of the $585,000 obligation. This included his SEP (Simplified Employee Pension) retirement account, his share in their joint bank account, and his share in the sale of their marital home. Debtor was without any retirement, marital property, and facing employment trouble. *Id.; Brugger,* No. 503 D.R.1996 at 6–7 (Joint Exhibit B).

### "[T]he timing of the petition"

Debtor filed under Chapter 13 on November 17, 1998, shortly after the October 15, 1998 common pleas decree and four days after the motion for reconsideration was denied by Judge Miller. (Docket Entries for Bankruptcy Case No. 5–98–03949), Joint Exhibit No. 1; Judge Linda Miller's Order denying Defendant's Petition for Reconsideration, No. 503 D.R. 1996, No. 2972 Civil 1996 (November 13, 1998)(Joint Exhibit D). Debtor filed when he realized that he could not satisfy the obligation ordered by the court. (Transcript of February 25, 1999 at 45.) Because the Debtor filed so close to the common pleas court decree, there is some indication that Debtor is attempting to use the Bankruptcy Court as a forum to relitigate the state court decision.

### "[H]ow the debt arose"

The debt arose as a result of Debtor's divorce and equitable distribution decree. (Divorce Decree, Joint Exhibit E).

### "[T]he Debtor's motive in filing the petition"

In testimony before this Bankruptcy Court, the Debtor said, "I was advised by counsel that the only way that I could even appeal and do anything was to file bankruptcy because in order to stay this transfer of all my personal assets, there was no other method." (Transcript of February 25, 1999 at 42–43.) Debtor also testified that he did not file to overturn Judge Miller's order; however, he was also not looking to follow the order because of mistakes that "render[ ] her decision false because it's all based on false data." (Transcript of February 25, 1999 at 42–43.) When specifically asked why he filed for bankruptcy, Debtor answered, "I filed for bankruptcy because I have no way to fulfill the Judge's Order and I'm—the money isn't there." (Transcript of February 25, 1999 at 44.)

### "[H]ow the Debtor's actions affected creditors"

Debtor's filing placed a stay on Creditor Spouse's state court equitable distribution award. At the time of the Debtor's Chapter 13 filing, Creditor Spouse had to use her own resources to live for approximately four months. Creditor Spouse is living with her mother in Florida because she cannot afford her own housing. Mr. and Mrs. Brugger's son lives in a converted garage and when their daughter is home from college, she shares a room with Creditor Spouse. Creditor Spouse does not have cable television and does not partici-

pate in any recreation. Creditor Spouse was forced to take a job as a waitress for $40 or $50 a week and later replaced that job as a bank teller for $12,000 a year to pay their children's car insurance, tuition, and other expenses. According to Creditor Spouse, these hardships were a result of Debtor filing for bankruptcy and not following through with his equitable distribution responsibilities. (Transcript of September 24, 1999 at 176–191.) After the stay was lifted by this Court on February 25, 1999, all transfers and credits listed in the divorce decree were satisfied except the balance of approximately $289,300 on the initial $585,000 award. (Transcript of September 24, 1999 at 14–22.) In November of 1998, Debtor began support payments of $750 a month for his son. (Transcript of September 24, 1999 at 183–184.)

### "[T]he Debtor's treatment of creditors both before and after the petition was filed"

Days before filing for bankruptcy, Debtor was involved in a number of financial transactions between himself, XICIS Corporation, and outside parties. (Transcript of September 24, 1999 at 62–76, 95–101.) These transactions concerned payment of money from XICIS to the Debtor and payment of credit card bills by Debtor. Consistently, Debtor would be reimbursed by XICIS for purchases he made for the corporation. Also, Debtor was reimbursed by the company for mileage, business travel, and health insurance to name a few. These payments resulted in Creditor Spouse being the only creditor listed in Debtor's bankruptcy. After the stay was lifted, Debtor satisfied all transfers ordered by the state court in full and filed a plan that was amended multiple times. (Transcript of September 24, 1999 at 14–22.) The Chapter 13 plan will be discussed later in this Opinion. As part of resolving this bankruptcy, Debtor offered to transfer all of XICIS Corporation to Creditor Spouse to satisfy his obligation, which was objected to by Creditor Spouse.

(Transcript of February 25, 1999 at 28, 67–71.)

### "[W]hether the Debtor has been forthcoming with the Bankruptcy Court and the creditors"

There are multiple issues raised by Creditor Spouse concerning Debtor's plan and amended plans. For the purposes of a good faith analysis, Debtor was forthcoming with the Bankruptcy Court to the effect that any inconsistencies in his schedules were neither intentional nor material to Creditor Spouse's claim.

The Debtor incurred a serious financial obligation when the state court ordered not only the transfer of approximately $295,700 of his share in divided marital property but a remaining obligation of $289,300. Because of this obligation and the downward earnings of XICIS Corporation, Debtor did not have the money to satisfy the debt. Equally weighing all of the factors listed above by taking into consideration the totality of the circumstances, the Debtor's actions did not rise to "a bad faith attempt to use and abuse Chapter 13 for a greedy and unworthy purpose." *Lilley*, 91 F.3d at 495 (quoting *In re Waldron*, 785 F.2d 936, 940–41 (11th Cir.1986)). Therefore, the Debtor's November 17, 1998 filing pursuant to Chapter 13 was within the "spirit of the Chapter" and not in bad faith.

Creditor Spouse next argues that even if the equitable distribution award is found to be a debt, and if the Debtor's filing is in good faith, it is considered alimony, maintenance, or support under 11 U.S.C. § 523(a)(5) and, therefore, the plan must provide for full payment under 11 U.S.C. § 1322(a)(2). The Bankruptcy Court, under federal law, determines if any part of the property distribution was intended as alimony, maintenance, or support under 11 U.S.C. § 523(a)(5), regardless of how the state court designated the award. *In re Gianakas*, 917 F.2d 759, 762 (3rd Cir.1990). Three indicators are used to determine whether the distribution was solely a property distribution;

for alimony, maintenance, or support; or a combination of both. *Id.* This determination focuses on the intent of the state court when the divorce decree was entered. *Id.*

■ The Bankruptcy Court first analyzes "the language and substance of the agreement in the context of surrounding circumstances, using extrinsic evidence if necessary." *Id.* at 762–63. According to Judge Miller, Creditor Spouse was not awarded alimony because she continued to draw an $8,000 monthly salary while the parties were separated. *Brugger*, No. 503 D.R.1996, at 6 (Joint Exhibit B). The state court reasoned that "after her draw ends based on a restructuring of distribution ... [Creditor Spouse] will have assets to sufficiently restructure her life." *Id.* The court modified the Master's Recommendation and restructured the payment of the $585,000 because Creditor Spouse had concerns that Debtor would file for bankruptcy. *Id.* at 6–7. Specifically, the court stated that "[i]n the alternative that alimony is not granted by the Court, the Plaintiff has requested that certain assets be awarded to her to reduce the amount owed to her from the proposed purchase of her shares in XICIS." *Id.* at 6. The court agreed with Creditor Spouse and awarded her:

1. The value of the 1996 Jeep Laredo in the possession of the Plaintiff but titled in the corporation—stipulated at oral argument to be $22,000.

2. The value of the Defendant's SEP retirement account—$125,458 (actual value of $166,000 at time of transfer). (Transcript of September 24, 1999 at 17.)

3. The value of the Defendant's share of bank and investment accounts—$61,011 (Debtor's share is approximately $31,000). (Transcript of September 24, 1999 at 18–19.)

4. The Defendant's interest in the sale price of the home valued at $203,000 ($55,000 was Debtor's share). (Transcript of September 24, 1999 at 16.)

5. The value of proceeds received by the Plaintiff in the sale of the Jeep Wrangler which was to be credited to the Defendant—$10,000.

6. The amount of credit to which the Defendant was entitled for mortgage, tax and insurance payments made by him from 12/1/96 to August 13, 1997 ($1,300 per month for nine months = $11,700 credited to Debtor). (Transcript of September 24, 1999 at 20–21.)

*Brugger*, No. 503 D.R.1996, at 6–7 (Joint Exhibit B). This award partially satisfied the $585,000 by approximately $295,700 leaving a remainder of about $289,300. *Id.* This off-set of the $585,000 obligation allowed Creditor Spouse enough money to restructure her life and suggested that the intent of the state court was to insure Creditor Spouse sufficient assets to live and not as a property settlement. *Id.* at 6.

The second indicator "is the parties' financial circumstances at the time of the settlement" or divorce. *In re Gianakas*, 917 F.2d at 763. At the Master's hearings on June 12 and 13 of 1997 and at the time of the Master's Report and Recommendation on July 21, 1998, Creditor Spouse's income was approximately equal to Debtor's income at a rate of $8,000 per month or $96,000 per year as Secretary/Treasurer for XICIS Corporation. (Transcript of September 24, 1999 at 192.) When Creditor Spouse began working at XICIS, her salary was approximately $28,000 a year. (Transcript of February 25, 1999 at 53–54.) This salary increase began in July of 1996, shortly after the divorce complaint was filed, and continued until October of 1998. (Transcript of February 25, 1999 at 54–56, 80.) Throughout her marriage, Creditor Spouse was the predominate homemaker and Debtor was the predominate wage earner. Creditor Spouse has a high school diploma and a Pennsylvania Cosmetology License she earned in 1976 that she has never used. (Master's Report ¶ 19 at 2–3.)(Joint Exhibit A) Creditor Spouse's

present education and age would not allow her to obtain employment to match her XICIS salary. (Master's Report ¶ 27 at 4.)(Joint Exhibit A) Furthermore, as a result of the bifurcation of these responsibilities, Debtor has an enhanced education and the expertise to operate the present corporation. Creditor Spouse and their children were forced to move to Florida to live with her mother and works as a bank teller earning approximately $12,000 per year. (Transcript of September 24, 1999 at 176–191.)

■■■■■ The Bankruptcy Court should also consider "the function served by the obligation at the time of the divorce or settlement." *In re Gianakas*, 917 F.2d at 763. "An obligation that serves to maintain daily necessities such as food, housing and transportation is indicative of a debt intended to be in the nature of support." *Id.* The underlying intent of the state court decision is crucial because "even an obligation designated as property settlement may be related to support because state courts often will adjust alimony awards depending on the nature and amount of marital assets available for distribution." *Id.* Many times the same result is achieved whether it is titled property division, alimony, support or maintenance. *Id.* "[T]he inquiry of the bankruptcy court should be limited to the nature of the obligation at the time it was undertaken." *Id.* At the time of the court order, Creditor Spouse was no longer receiving her XICIS salary, was taking care of their children, and was forced to move to Florida and live with her mother. Judge Miller's modification addressed these adversities and allowed Creditor Spouse to afford the basic necessities of life.

■■■■■ The application of the three *Gianakas* indicators shows that Judge Miller's $295,700 transfer of Debtor's assets to Creditor Spouse was intended as alimony, maintenance, or support. However, I find that the remaining debt of $289,300 is equitable distribution under 11 U.S.C. § 523(a)(15). It is not necessary to fur-

ther address 11 U.S.C. § 523(a)(15) inasmuch as any obligation under this subsection would have no greater priority than other unsecured creditors. Since the record indicates that all of the transfer obligations under 11 U.S.C. § 523(a)(5) have been satisfied, all that remains is the $289,300 debt to be addressed in Debtor's Chapter 13 plan.

■■■■■ The next issue that needs to be considered is whether the Debtor's plan is confirmable under 11 U.S.C. § 1325(a)(4), which states that

the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date[.]

Debtor filed his first plan on December 4, 1998. (Docket Entries for Bankruptcy Case No. 5–98–03949, Joint Exhibit No. 1; Chapter 13 Plan of William Brugger dated 12/4/98, Joint Exhibit 5) Creditor Spouse objected to the plan and Debtor amended his plan on February 25, 1999. (Docket Entries for Bankruptcy Case No. 5–98–03949, Joint Exhibit No. 1; Chapter 13 Plan of William Brugger dated 2/25/99, Joint Exhibit 6) Creditor Spouse objected to the amended plan and Debtor filed a second amended plan on March 25, 1999. (Docket Entries for Bankruptcy Case No. 5–98–03949, Joint Exhibit No. 1; Chapter 13 Plan of William Brugger dated 3/25/99, Joint Exhibit 7) Creditor Spouse again objected to the plan and a trial was held at this Court on September 24, 1999, concerning the confirmation of the Chapter 13 plan. (Docket Entries for Bankruptcy Case No. 5–98–03949, Joint Exhibit No. 1) The trial resulted in the matter being taken under advisement and the record was closed except for submission of expert testimony by deposition. *Id.*

On December 9, 1999, Creditor Spouse entered the deposition of Robert E. Vitale,

CPA, CVA, as an expert valuation of XICIS Corporation. Mr. Vitale authored a report titled, "XICIS Corporation Business Value Calculation Report as of November 17, 1998." Mr. Vitale identified the three generally accepted methods for valuation purposes; the Asset Based Approach, the Market Based Approach, and the Income Approach. (Deposition of Robert E. Vitale, December 3, 1999, Exhibit 1 at 3.) Mr. Vitale valued XICIS Corporation using a combination of the Asset Based Approach and the Income Approach to determine the "total fair value of the Company." (Vitale, Exhibit 1 at 3–6.) Mr. Vitale did not use the Market Based Approach because of the young age, modest sales, and lack of a freely traded market of XICIS Corporation's shares. (Vitale, Exhibit 1 at 3.) Under the Asset Based Approach, Mr. Vitale estimated XICIS Corporation's "net tangible asset value" to be $360,380. (Vitale, Exhibit 1 at 3–5.) Using the Income Method, Mr. Vitale estimated the "present value of the future net income stream" of XICIS Corporation to be $546,229. (Vitale, Exhibit 1 at 5–6.) Merging the two results, Mr. Vitale concluded that on November 17, 1998 the "total fair value" of XICIS Corporation was approximately $907,000. (Vitale, Exhibit 1 at 6.) Therefore, Debtor's 50% ownership would be worth $453,500 to Mr. Brugger. Mr. Vitale made clear in his deposition that he did not do a Fair Market Value analysis. (Vitale, Exhibit 1 at 9 and 49.)

On December 16, 1999, Debtor entered the deposition of Robert Victor Haas, Jr., ASA, CPA, as an expert valuation of XICIS Corporation. Mr. Haas authored a report titled, "Valuation Report of a 50–Percent Stock Interest in XICIS Corporation" assessing the Fair Market Value of XICIS Corporation as of October 31, 1999. Mr. Haas also identified the three general methods for valuation; the Asset Value Approach, the Market Guideline Approach, and the Income Capitalization Approach. (Deposition of Robert Victor Haas, Jr., December 13, 1999, Exhibit 2 at 20.) Mr.

Haas valued XICIS Corporation using only the Asset Value Approach. (Haas, Exhibit 2 at 21–26.) Mr. Haas concurred with Mr. Vitale that the Market Based Approach or Market Guideline Approach was not appropriate in this valuation because of the sales, size, and specialized nature of the company. (Haas, Exhibit 2 at 24–25.) Mr. Haas did not use the Income Capitalization Approach because he opined that "based upon the historical trends of the past few years ... forecasts of any material profits would be speculative" for XICIS Corporation. (Haas, Exhibit 2 at 20–21.) Following only the Asset Value Approach and using a "20–percent discount for lack of marketability and lack of control," Mr. Haas estimated that a "Fair Market Value of a 50–percent interest in ... XICIS Corporation as of October 31, 1999 on a minority, nonmarketable, and going-concern basis" was $82,000. (Haas, Exhibit 2 at 24.)

The evidence, therefore, supports a range of value between $82,000 and $453,000 for a 50% interest in XICIS Corporation. Taking into consideration the two expert valuations listed above, the Debtor's plan must, at the least, provide Creditor Spouse $82,000. (Transcript of February 25, 1999 at 53–54.) Debtor's second amended plan filed March 25, 1999, provides for payment to the Chapter 13 Trustee of $600 per month for (36) months. (Docket Entries for Bankruptcy Case No. 5–98–03949, Joint Exhibit No. 1; Chapter 13 Plan of William Brugger dated 3/25/99, Joint Exhibit 7) Not considering satisfaction of administrative claims under 11 U.S.C. § 507, the most Creditor Spouse would realize under this plan is $21,600. This plan does not meet the requirements for confirmation under 11 U.S.C. § 1325(a)(4). Therefore, Creditor Spouse's objection to Debtor's second amended plan must be sustained.